87 F.Supp. 650 (1949)
MYTINGER & CASSELBERRY, Inc.
v.
EWING et al.
Civ. A. No. 5208-48.
United States District Court for the District of Columbia.
December 14, 1949.
*651 Charles S. Rhyne of Washington, D. C., and Lester L. Lev of Los Angeles, California, for plaintiff.
Vincent A. Kleinfeld of Department of Justice and William W. Goodrich of Federal Security Agency, of Washington, D. C., for defendants.
Before CLARK, Circuit Judge and GOLDSBOROUGH and TAMM, District Judges.
*652 PER CURIAM.
This cause came on to be heard before this specially constituted Court of three judges convened pursuant to the provisions of Section 2284, Title 28 U.S.C.A. Evidence and briefs having been submitted, oral argument of counsel had and the Court being now duly advised in the premises makes the following Findings of Fact and enters the following Conclusions of Law:

Findings of Fact
1. Plaintiff is a California corporation, having its principal place of business in the City of Long Beach, California. Defendant Oscar R. Ewing is the Administrator of the Federal Security Agency; and Defendants J. Howard McGrath is the Attorney General of the United States and was substituted as a defendant in place of Tom C. Clark on October 17, 1949. Defendants Paul B. Dunbar, Charles W. Crawford, Louis D. Elliott and George P. Larrick are the Commissioner, Associate Commissioner and Assistant Commissioners, respectively, of the Food and Drug Administration of the Federal Security Agency; Defendants are all charged by law with the administration and enforcement of the Federal Food, Drug, and Cosmetic Act of 1938, 21 U.S. C.A. § 301 et seq.
2. This suit arises from administrative action taken by the defendants under that part of Section 304(a) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 301, 334(a), which provides that more than one libel for condemnation proceeding may be brought upon the same alleged misbranding "when the Administrator has probable cause to believe from facts found, without hearing, by him or any officer or employee of the Agency that * * * the labeling of the misbranded article * * * would be in a material respect misleading to the injury or damage of the purchaser or consumer"; and under Sections 2282 and 2284 of Title 28 of the United States Code Annotated, Judiciary and Judicial Procedure, which provides the procedure by which this court was convened to hear an application to restrain the enforcement, operation, or execution of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 301 et seq., for repugnance to the United States Constitution. (Complaint, Par. 2; Answer, Third Defense, Par. 2).
3. The plaintiff is the exclusive national distributor of a food supplement consisting of multiple vitamins and minerals sold under the trade name of "Nutrilite Food Supplement" (hereinafter called Nutrilite) through more than 5,000 distributors throughout the United States.
4. Nutrilite contains certain vitamins and minerals in a balanced proportion and in amounts claimed by some experts in the field as essential in human nutrition, plus extracts from alfalfa, parsley and watercress.
5. Nutrilite contains no substance or material or combination of substances or materials harmful or deleterious in any manner to human users thereof when taken in suggested dosage. No claim has been made by any Federal, State or other governmental agency that Nutrilite is adulterated or harmful in any manner to the health of human users thereof, insofar as the record before the court shows.
6. The label of the package in which Nutrilite was and is sold complies with all requirements of the Food, Drug, and Cosmetic Act of 1938.
7. The objection of the defendants to the sale of Nutrilite, which is the basis of this action, is the use by plaintiff of an advertising pamphlet entitled "How to Get Well and Stay Well". Nutrilite is sold directly to users thereof and this pamphlet is used in making about 40% of the initial sales of Nutrilite.
8. The product now sold as Nutrilite was first marketed about 1933; defendants' records show they received information about it in 1939 and had correspondence about it in 1940; plaintiff has been its exclusive national distributor since 1945; defendants received their first copies of the then current edition of the pamphlet "How to Get Well and Stay Well" on December 5. 1946, together with names and addresses of certain of plaintiff's distributors outside of California.
9. In June 1947, the Food and Drug Administration sent plaintiff a notice of a *653 hearing under Section 305 of the Food, Drug and Cosmetic Act of 1938. This notice and hearing are provided for prior to institution of criminal proceedings under the Act and said notice provided that it related solely to "possible criminal action" and not to action "involving the seizure of the article" in libel cases. At the time of the hearing, July 15, 1947, Nutrilite Products had been in business some 15 years and up to 5 years before the time of said hearing Nutrilite representatives had been bringing Nutrilite labeling to the Los Angeles office of the Food and Drug Administration for comment and there had been no change in the labeling in the preceding five years. Neither the notice nor the statements of the Food and Drug Administration representative at the hearing specified any exact objections to particular language in the then current edition of the pamphlet "How to Get Well and Stay Well", but plaintiff's attorney advised plaintiff he thought he understood the objections of the Food and Drug Administration and he advised the Food and Drug Administration's representative that the pamphlet would be revised to eliminate these objections.
10. Plaintiff's attorney further advised the Food and Drug Administration on October 4, 1947, that the rewriting of plaintiff's pamphlet had commenced promptly and was progressing as rapidly as possible considering the quantity of the material involved and the corrections required by him and that when finally completed he was sure none of the literature of plaintiff would be objectionable to said Administration.
11. There are three editions of the plaintiff's advertising pamphlet, "How to Get Well and Stay Well", which are involved in the libel seizure cases, hereinafter described: the 58-page edition which was used by plaintiff from January 1948 until a few days after the first seizure in October, 1948, and which is identified in the record as plaintiff's Exhibit #1; the 36-page edition consisting of the first 36 pages of the 58-page edition, which was used from the time the 58-page edition was discontinued up to about December 1, 1948, and which is identified in the record as plaintiff's Exhibit #2; and the 42-page edition consisting of the 36-page edition changed slightly in non-substantial statements plus 6 additional pages, which has been used from about December 1, 1948 up to the time of the trial herein, and which is identified in the record as plaintiff's Exhibit #3.
12. (a) The three editions of the advertising pamphlet "How to Get Well and Stay Well" which are involved in and form the basis of the seizure actions hereinafter described, were written and prepared chiefly by William S. Casselberry, President of the plaintiff corporation. He has an A.B. degree from the University of California and M.A. and Ph.D. degrees from Stanford University. Prior to writing "How to Get Well and Stay Well" he read some medical and nutritional literature on the subject of vitamins and minerals. In the preparation of the three pamphlets he relied upon some scientific and medical treatises; surveys made by the medical profession with respect to the use of vitamins and minerals; publications of the Federal Government relating to the amount of vitamins and minerals required in the diet of humans and the efficacy of vitamins and minerals in human nutrition; and the findings and statements made by the Food and Drug Administration with respect to the need for and desirability of vitamins and minerals in the human diet.
(b) The rewriting of the pamphlet required a period of approximately five months. During this period Dr. Casselberry checked the various drafts of the pamphlet with his company's attorney, the chemist who discovered and developed Nutrilite's secret base, and with neighbors to get the reactions of laymen to the pamphlet.
(c) Plaintiff's attorney, who supervised the rewriting, has specialized in the Food and Drug Act field for many years. He has in his library, and has read, a number of books and scientific writings written by medical doctors and others in the field of nutrition, vitamins and minerals. Defendants have stated that he is an experienced attorney in this field. He has approved the final drafts of each edition of the pamphlet before plaintiff began using them.
(d) The beneficial effects of vitamins and minerals for nutritional deficiencies is a *654 well established medical fact. Many of the statements in the pamphlet about the beneficial effects of particular vitamins and minerals for nutritional deficiencies are confirmed by the admissions of the defendants herein.
(e) The three pamphlets (P's. Exs. #1, 2 and 3), when read as a whole and fairly interpreted, without lifting statements therein out of context, do no more than represent that Nutrilite is a vitamin-mineral food supplement designed and intended to build up the bodies of human users thereof in order that it may aid nature to help the users enjoy better health through better nutrition. Said pamphlets do not represent to the minds of ordinary, reasonable and prudent persons that all of the symptoms, conditions and diseases of the human body necessarily or generally result from dietary deficiencies alone, or that all of the symptoms, conditions and diseases of the human body can be prevented, cured or treated by the use of Nutrilite, and said pamphlets do not represent, suggest, or imply that Nutrilite is a medicine or drug, or that it is efficacious or beneficial in the prevention, treatment, or cure of all diseases.
These pamphlets represent the product only as a food supplement containing vitamins and minerals beneficial to building up health and bodies and in alleviating, in some but not in all instances, symptoms resulting from vitamin and mineral deficiencies in the diet. Purchasers and consumers do not understand from these pamphlets that Nutrilite is a treatment or cure for any disease. The defendants' own survey to determine the impression gained by purchasers and consumers of the representations contained in these pamphlets under customary conditions of purchase and use reveals that the users interviewed uniformly came to these conclusions and understandings of the statements in the pamphlets.
(f) These three pamphlets when read as a whole are not fraudulent, misleading in a material respect to the injury or damage of the purchaser or consumer, or false or misleading in any particular. Neither Nutrilite nor its labeling has been made the basis of a prior judgment in favor of the United States in any case or proceedings finding it to be misbranded or adulterated, nor do these pamphlets misbrand the product Nutrilite Food Supplement within the intent of the provisions of the Food, Drug, and Cosmetic Act of 1938. It is therefore found that the plaintiff has been and is acting in good faith in preparing and using these pamphlets.
13. After the plaintiff's rewriting of the pamphlet, and its publication in January, 1948, plaintiff learned that agents of the Food and Drug Administration were interrogating some of plaintiff's distributors and customers. In order to determine the basis for such interrogations, plaintiff arranged a meeting with representatives of the Food and Drug Administration at the Administration's office in Los Angeles. Plaintiff stated to the Chief of said Administration's office that it wished to comply with every phase of the Food, Drug, and Cosmetic Act and asked whether the investigation and interrogations were prompted by a belief that any part of plaintiff's label or labeling in any way violated any provision of said Act. The said Chief advised plaintiff that the investigation and interrogations were merely routine in nature and said Chief made no statement implying or suggesting that the Food and Drug Administration had any objection to the pamphlet "How to Get Well and Stay Well".
Plaintiff further stated to said Chief that should any question arise any time in the future concerning the alleged violation of said Act (misbranding) by any product distributed by plaintiff or in connection with any phase of plaintiff's business or operations, that if the Food and Drug Administration would notify the plaintiff thereof immediately when such question arose, plaintiff would do its utmost to comply with the views of the Food and Drug Administration.
14. On September 15, 1948, a secret indictment was returned in Los Angeles against the plaintiff's two principal stockholders, Lee S. Mytinger and William S. Casselberry, based upon allegations of misbranding of Nutrilite by the edition of the pamphlet "How to Get Well and Stay Well" obtained by defendants on December *655 5, 1946, products shipped by plaintiffs on January 3, 1947 and February 26, 1947, and which were involved in the notice and hearing thereon in July, 1947. The Federal Judge to whom this indictment was assigned for trial has advised the parties that he considers the trial a waste of Government money due to the discontinuance of the labeling there questioned. This indictment has not yet been set for trial.
15. On October 6, 1948, without prior notice to plaintiffs, the defendants instituted or caused to be instituted and commenced a libel action under which some packages of Nutrilite and some copies of the 58-page pamphlet "How to Get Well and Stay Well" were seized in Belleville, New Jersey. Said libel alleged the misbranding of Nutrilite through the use of pages 37 through 58 of the 58-page edition of said pamphlet.
16. On September 28, 1948, defendant Crawford had authorized said seizure action of October 6, 1948, in Belleville, New Jersey, without reading pages 1 through 36 of this 58-page pamphlet. A reading of pages 1 through 36 of this pamphlet is hereby found to be essential in fairly interpreting pages 37 through 58.
17. On September 30, 1948 defendant Crawford authorized multiple seizures of Nutrilite in an ex parte secret decision holding the 58-page pamphlet would be and is misleading in a material respect to the injury or damage of the purchaser or consumer. This decision was made without reading all of the 58-page pamphlet or rereading pages 37-58, and it is admitted that defendant Crawford had not read all of the 58-page pamphlet prior to January 28, 1949. When this decision was made he had before him no facts showing injury or damage by Nutrilite or the 58-page pamphlet to any purchaser or consumer of Nutrilite and no facts showing that any user, purchaser or consumer of Nutrilite had made any complaint against the product or the 58-page pamphlet. No notice or copy of this decision was given or disclosed to plaintiff, and plaintiff's first knowledge of its existence and contents came on January 17, 1949, when defendants filed a copy thereof in this Court.
Defendant Crawford is not a nutritional expert but claimed he had before him this time (but not on September 28), and relied upon, a so-called finding of fact in writing which purported to be signed by a Dr. Robert C. Butz, an employe of the Food and Drug Administration, and which was dated September 30, 1948. Dr. Butz was not an employe of the Food and Drug Administration at the time of the trial of this cause.
18. (a) Defendants' actions in initiating and carrying out the multiple seizures of Nutrilite are primarily attributed by them to certain findings of fact on plaintiff's pamphlets entitled "How to Get Well and Stay Well" purportedly by Dr. Robert C. Butz, then an employe of the Food and Drug Administration. The defendants who had made said decisions each testified that they had not discussed said findings with Dr. Butz. These findings were offered in evidence by defendants and received for the limited purpose of proving their existence as a part of the decision made by defendant Crawford and the decisions referred to herein as having been made by defendants Larrick, Dunbar and Mr. Kingsley, in holding said pamphlets to be misleading, and not as proof of the facts contained in said findings. Dr. Butz was not produced as a witness and no evidence was offered that he actually and personally made the findings or that he based them upon plaintiff's product or pamphlets.
(b) The defendants admitted in open Court that they had not contacted Dr. Butz to see if he was available to them as a witness, offered no proof of his unavailability as a witness, and in fact stated defendants would not make any effort to obtain him as a witness. After specifically warning Counsel for the defendants that these circumstances would cause the Court to draw an unfavorable inference against defendants on the qualifications of Dr. Butz, and defendants' right to rely upon him, the Court admitted into evidence a deposition given by Dr. Butz as an adverse witness, under subpoena, of the plaintiff.
(c) In the deposition he repudiated some of the statements in said findings. The deposition indicated he consulted four medical *656 doctors of the Food and Drug Administration on vitamins and minerals in general, but not on Nutrilite in particular. He had seen no assay or analysis of the contents of Nutrilite. He did not read the 58-page pamphlet in connection with the finding of September 30, 1948, but relied upon excerpts therefrom. He did not connect or identify the statements in his findings with any representations in the 58, 36 or 42-page pamphlet.
(d) The four medical doctors employed by the Food and Drug Administration whom Dr. Butz named as his consultants did not testify herein. Defendants have never conducted any experiments to determine the effect of Nutrilite upon deficiency diseases or any other ailment.
(e) From the facts herein, the Court finds that the defendants Crawford, Larrick, Dunbar and Mr. Kingsley, when they made their respective decisions described herein acted arbitrarily, capriciously and unreasonably in placing reliance upon any of the so-called findings of Dr. Butz, the circumstances under which the findings were prepared, the contents thereof, the knowledge of those making decisions on plaintiff's said pamphlets, their actual reliance upon Dr. Butz, and the other actions of defendants herein which are claimed to be connected with the purported findings of Dr. Butz. It is further found that defendants' failure to produce or to try to produce Dr. Butz as a witness raises an inference that if he had testified in person his testimony would have been adverse to defendants.
19. On October 11, 1948, plaintiff received a copy of the libel papers filed in the Belleville, New Jersey, case on October 6, 1948, and learned therefrom for the first time that defendants were objecting to pages 37 through 58 of the 58-page pamphlet. Plaintiff immediately, on the same day, sent telegrams to all of its top agents throughout the United States instructing them in part as follows:
"Inform all agents and distributors in your group immediately that pending court ruling pages 37 through 58 inclusive of customer book * * * must not be used in selling Nutrilite. Remove pages 37 to 58 by cutting along fold with sharp knife. Wrap, seal and place disputed material in third party's hands to be held pending final ruling. Books * * * in hands of prospects, junior distributors and customers to be treated in same way. Full explanation will appear with Nutrilite News, but follow above instructions at once."
A bulletin containing a full explanation was then mailed directly to all of plaintiff's agents and distributors to insure that every salesman in plaintiff's organization would get the information on discontinuance of use of pages 37-58 and would follow instructions. This explanation stated that regardless of whether the Food and Drug Administration is right or wrong, the plaintiff wanted to follow that Administration's views.
20. On October 12, 1948, the plaintiff's attorney advised the Food and Drug Administration in Washington, D. C., by letter, that use of pages 37 through 58 of the 58-page pamphlet had been ordered to be discontinued by all of plaintiff's agents and distributors by said telegram and said bulletin immediately upon receipt of said libel papers. He also advised:
"In this connection I want to say that the filing of this libel in New Jersey was the first intimation that we had received that any of the literature we are using at present was objectionable to your office. In the future I will appreciate it if you will advise me if you find anything in our literature that you take exceptions to. Mytinger and Casselberry are a reputable firm, and are desirous of co-operating with your Agency in every way possible. I need not point out that the offense of `misbranding' is not a well defined one in the light of present day scientific knowledge, and it is very easy for a firm in the nutritional supplement field to make statements in the best of faith which do not `square' with the views of your office. In this case a letter from your Agency pointing out your objections would bring about a correction without the necessity of court action.

* * * * * *
"With mutual cooperation, I believe that much trouble and expense can be saved for all parties concerned."
*657 This letter and the facts set forth in paragraph 19 hereof show plaintiff was, in good faith, trying to comply with defendants' interpretations of the Food, Drug, and Cosmetic Act of 1938.
21. On October 19, 1948, after failing to answer this said letter of October 12, 1948, the defendants made a second similar seizure in New York City.
22. The libel papers in this said second seizure action and the libel papers in the eight additional seizure actions described hereinafter contain statements which are in substance identical. There are no separate issues of fact or law necessitating more than one such action, as a decision in the first libel action would settle all said issues with respect to the alleged misbranding of Nutrilite by the use of the three editions of the pamphlet "How to Get Well and Stay Well". These libel seizure actions having been instituted in widely separated jurisdictions in the United States inflicted unnecessary punishment and expense on the plaintiff.
23. The October 19, 1948 seizure and the ten other seizures hereinafter found to have been made and instituted against plaintiff's product Nutrilite, were made under the provisions of Section 334(a) of Title 21 of the United States Code Annotated which permits multiple libel seizure actions based upon the same alleged misbranding "when the Administrator has probable cause to believe from facts found, without hearing, by him or any officer or employee of the Agency * * * that the labeling of the misbranded article * * * would be in a material respect misleading to the injury or damage of the purchaser or consumer."
24. On approximately October 18, 1948, plaintiff agreed to the request of the Government that the indictment matter in California be continued to December 5, 1948, upon plaintiff's understanding that the defendants contemplated making no more seizures. However, other seizures were made thereafter.
25. On October 28, 1948, the third said similar seizure was made in Buffalo, New York.
26. In November, 1948, plaintiff requested defendants to agree to consolidation and trial in the United States District Court in Los Angeles, within 25 miles of plaintiff's principal place of business in Long Beach, of the said three libel seizures which had then been filed. Defendants refused said request and informed plaintiff that they would agree to consolidation for trial of the three cases in Phoenix, Arizona, or in San Francisco, California, only. Defendants at the same time advised the plaintiff that they had already approved further seizures and did not promise to withhold said seizures if the first three were consolidated for trial.
27. After plaintiff and its agents and distributors had removed the pages objected to in the first libel action, the remaining 36 pages of the 58-page edition of "How to Get Well and Stay Well" were used for a short period while an epilogue was being written to complete said booklet. This 36-page edition is identical with the first 36 pages of the 58-page edition of said pamphlet which Defendant Crawford had before him in making his decision of September 30, 1948. Subsequently, 6 pages were added to the said 36-page booklet which did not alter or enlarge the sense and meaning of the first 36 pages. The addition of these pages resulted in the so-called 42-page edition of "How to Get Well and Stay Well" which has been used by plaintiff since approximately December 1, 1948.
28. On December 1, 1948, the fourth said similar seizure was made in Hastings, Nebraska.
29. On December 2, 1948, the defendant Larrick made an ex parte decision holding that the 36-page edition of the pamphlet "How to Get Well and Stay Well" would be and is misleading in a material respect to the injury or damage of the purchaser or consumer. Defendant Larrick at the time of his December 2, 1948 decision knew that defendant Crawford, in his decision of September 30, 1948, had these 36 pages before him and that defendant Crawford had not found these 36 pages to be objectionable and that said 36 pages of the said 58-page pamphlet were identical with the 36-page *658 pamphlet before him. He knew of the communication from plaintiff's attorney requesting an opportunity to comply with future objections, as described in paragraph 20 hereof. He had no facts before him at the time of his decision showing that Nutrilite or any of its labeling, including the 36-page pamphlet, had damaged or injured any purchaser or consumer. He is not a nutritional expert and claimed that he relied on a so-called finding of fact purportedly made by Dr. Robert C. Butz, referred to in paragraph 18 hereof and "accepted Dr. Butz' conclusions as to the misleading character of the statements in it". Said decision of defendant Larrick was not disclosed to plaintiff until Jan. 17, 1949, when a copy thereof was filed in the instant case. The findings in said paragraph 18 as to Dr. Butz and defendant Larrick apply here.
30. On December 9, 1948, defendant Dunbar made an ex parte decision holding that the 42-page edition of plaintiff's pamphlet "How to Get Well and Stay Well" would be and is misleading in a material respect to the injury or damage of the purchaser or consumer. This matter was brought to him for decision by a Mr. Murray, an employe of the Food and Drug Administration and author of a memorandum indicating that the defendants planned to "keep the pressure" on plaintiff. Mr. Murray informed defendant Dunbar that he (Murray) was considering a number of seizure recommendations against Nutrilite based on the labeling contained in the 42-page pamphlet. Defendant Dunbar read only certain unidentified parts of the pamphlet pointed out to him by Mr. Murray before making his decision that the pamphlet was misleading and relied on oral statements made to him by Mr. Murray. He had before him at the time of his decision no facts showing damage or injury to any purchaser or consumer by Nutrilite or any of plaintiff's labeling, and had not seen nor heard of any complaints that Nutrilite or its labeling had injured or damaged any person. He did not consider the report on the defendants' own survey to determine how purchasers and consumers interpreted this pamphlet, although it was then in his files. He, too, testified that he was not a nutritional expert but claimed he relied upon a finding of fact purportedly made by Dr. Butz and the findings in paragraph 18 hereof on Dr. Butz and defendant Dunbar apply here. This decision of defendant Dunbar was not disclosed to plaintiff until January 17, 1949, when a copy thereof was filed in the instant case.
31. Through the actions of defendants, additional similar seizures of Nutrilite and said pamphlets were then made in the following places:

Belleville, New Jersey December 15, 1948
Spokane, Washington December 23, 1948
Seattle, Washington December 30, 1948
Clarkfield, Minnesota December 31, 1948
St. Petersburg, Florida January 4, 1949
Chicago, Illinois January 3&4, 1949

Finding 22 hereof covers the similarity of issues in these cases. These seizures were made after defendants had made a survey to determine whether plaintiff's said pamphlets were misleading in any particular to consumers and purchasers thereof under customary conditions of purchase and use and after said survey had revealed that said pamphlets were not in fact misleading in any particular to purchasers and consumers.
32. (a) On December 30, 1948, the instant injunction action was filed. At this time it was the intention and plan of the defendants to file many more libel seizure actions and seize Nutrilite throughout the Nation. The Food and Drug inspectors knew of this general policy.
(b) It was the plan of defendants to keep a sustained pressure against plaintiff through such seizures until an injunction was granted in the instant action or the indictment case in California based upon the discontinued literature went to trial. This plan of defendants is set forth in writing in a memorandum written by A. G. Murray, an administrative officer of the Food and Drug Administration, and addressed to the Division of Field Operations of the Food and Drug Administration. It was not denied that Mr. Murray was and is under the control of the defendants and that he was present in Court. No effort was made by the defendants to call Mr. Murray and explain *659 the circumstances under which the memorandum was written and used. Defendant Larrick admitted that said memorandum was an accurate statement of defendants' policy in regard to plaintiff, and that said memorandum was circularized in the offices of the Food and Drug Administration and created a general impression in said offices highly prejudicial to plaintiff, The Court presumes, from defendants' refusal to call Mr. Murray as a witness, that his testimony, not only in regard to the contents and use of said memorandum, but also in regard to the seizure recommendations presented to defendant Dunbar by him, would have been adverse to the defendants.
(c) Defendants made no effort to secure an early trial in the libel cases and in order to effect seizures more quickly, mimeographed copies of the booklets "How to Get Well and Stay Well" were prepared for transmission to United States Attorneys.
33. On January 17, 1949, defendants filed in the United States District Court for the District of Columbia a motion to dismiss the complaint herein.
34. On January 24, 1949, Judge David A. Pine of the United States District Court for the District of Columbia found that the actions of the defendants in rendering said decisions were "unfair", "drastic", "shocking", and "harsh" and held that the decisions of defendants Crawford, Larrick and Dunbar, described supra, were unlawful because the Administrator of the Federal Security Agency did not have the authority to delegate this power to make such decisions to said defendants.
35. (a) On January 28, 1949, at the request of defendant Dunbar, the Acting Administrator of the Federal Security Agency, J. Donald Kingsley, made three decisions identical in language with the three decisions of defendants Crawford, Larrick and Dunbar, supra, (paragraphs 17, 29 and 30) respectively. He is not a nutritional expert but claimed he relied upon three so-called findings purportedly made by Dr. Robert C. Butz.
(b) Kingsley did not talk to Dr. Butz or identify the Butz findings contained in defendants' Ex. No. 23 as those upon which he (Kingsley) relied in connection with any particular one of his three decisions. He is uncertain as to which version or versions of the pamphlet he had before him, and did not read all three pamphlets before making his decision condemning all three as misleading in a material respect to the injury or damage of the purchaser or consumer. Kingsley did not consider the defendants' own investigation and report thereon in his files showing that consumers and purchasers did not receive a misleading impression from reading plaintiff's pamphlets.
(c) Kingsley had no facts before him showing injury or damage to any purchaser or consumer of Nutrilite by the product or its labeling, and had no facts before him showing any complaints of injury or damage from Nutrilite or its labeling.
(d) Kingsley, as Acting Administrator of the Federal Security Agency, twice refused requests of plaintiff that he grant it a hearing prior to making a decision on whether Nutrilite was misbranded by said labeling, the three editions of the pamphlet "How to Get Well and Stay Well". Said requests advised him that if officials of the Food and Drug Administration asked him to make a decision that plaintiff's advertising and labeling were misleading in a material respect to the injury or damage of the purchasers or consumers of Nutrilite, plaintiff could present him with the full and true facts showing that the labeling of Nutrilite was not misleading in any respect. He was advised by plaintiff that the consequences of an erroneous decision on this matter by him would be that plaintiff would be put out of business completely and irreparably damaged by the multiple seizures so authorized and threatened by defendants prior to any possible opportunity plaintiff might have to defend itself against said decision. He twice denied this request for a hearing prior to his decisions, talked only to his own counsel and to defendants Dunbar and Crawford about the decision of Judge Pine, and made an ex parte decision that plaintiff's labeling is misleading. The findings in paragraph 18 hereof on Dr. Butz and Mr. Kingsley apply here.
(e) Defendants did not produce Kingsley as a witness or prove that he was *660 unavailable to them as a witness, and his deposition is incomplete. Counsel states therein that the deposition is to be completed at a later date when certain records, which defendants refused to produce at the time of the taking of the deposition, were made available under Court order. The order was made but the deposition was not completed. Defendants' failure to produce Kingsley as a witness, or to prove his unavailability to them as a witness, warrants an inference that if he had testified his testimony would have been adverse to defendants.
36. On March 3, 1948, Judge David A. Pine granted a motion to dismiss plaintiff's complaint with leave to amend and the Amended Complaint, which is before this Special Three-Judge Court, was then filed. A temporary restraining order was then signed enjoining defendants from making any further seizures of Nutrilite pendente lite.
37. On April 5, 1949, plaintiff filed a motion in the Federal District Court in Newark, New Jersey, to consolidate the ten libel actions for trial in Los Angeles, California, which motion defendants opposed. Said motion was argued on Monday, September 19, 1949, at which time it was the defendants' general position that the defendants did not want the libel issues tried in Federal Court in Los Angeles. Three days later, on Thursday, September 22, 1949, however, the defendants filed an injunction action in the very Federal Court in Los Angeles involving identical issues insofar as plaintiff's pamphlet "How to Get Well and Stay Well" is concerned. The defendants' action herein was deliberate and arbitrary to increase the plaintiff's irreparable damage. Defendants knew that plaintiff could consolidate all such actions and that the only accomplishment of the filing of the numerous seizure actions would be the irreparable injuries set forth in finding 39 herein.
38. The defendants have caused embargoes to be instituted and placed on Nutrilite prior to the institution of libel for condemnation proceedings in New York, New Jersey, Washington State, Florida, and various localities in the United States by requests to State and local health authorities, which embargoes naturally frightened agents, distributors and customers of Nutrilite and had very much the same damaging and injurious effect as the seizures. These embargoes obtained in widely scattered jurisdictions of the United States caused maximum and irreparable injury to plaintiff.
39. The seizure actions caused plaintiff a sales loss of some $100,000 per month from the time of the first seizure until the instant action was filed, and the defendants were restrained from making further seizures. The seizures had the effect of frightening plaintiff's agents and distributors, so that they worked less, and some resigned, with the net result of loss of morale among agents and distributors, loss in sales volume and loss of personnel. Unfavorable opinions and injurious information with respect to the labeling of plaintiff's product reached many private individuals and organizations. Publicity about the seizure cases initiated by defendants appeared in newspapers and magazines in a way which did injuriously damage plaintiff and this led to loss of customers. Plaintiff was compelled to hire counsel in the ten libel cases and put up bonds and costs in each case. The value of the Nutrilite seized by defendants in the ten libel actions is $6,822.17 and the product so seized will be unsaleable if returned to plaintiff. The nature of plaintiff's business makes good-will of the public one of its most valuable assets and the acts of the defendants in the embargoes and seizure actions in widely separated parts of the United States has caused the plaintiffs injury and damage. Defendants admit injury to plaintiff and that there has been a serious impact on plaintiff's rights by their actions, and that there is no provision of law requiring or permitting defendants to reimburse plaintiff for the damages herein found or for the injury or for destruction of its business and good-will by the actions of the defendants, in the event of a determination of said libel actions in favor of plaintiff. The injury and damage to plaintiff which has occurred and which is threatened *661 by defendants is therefore substantial and irreparable.
40. The defendants have never advised plaintiff of the particulars of plaintiff's literature considered to be objectionable by defendants. The defendants have not provided an opportunity to plaintiff whereby such literature could be corrected, revised and amended in a manner which could conform to the views of and be acceptable to the defendants.
41. That plaintiff would have been subjected to many additional seizures of its product throughout the United States in addition to the existing 11 seizures of its product, if not enjoined from so doing, is admitted by defendants. It was a general policy and plan of the defendants to make with all possible speed many seizures of plaintiff's product. Such additional seizures, and the product could be seized by defendants in the hands of more than 5,000 of plaintiff's distributors, would have the effect of destroying plaintiff's business prior to any possible adjudication of the disputed issues on plaintiff's labeling in any of the libel actions already filed or threatened.
42. There was and is no emergency involving injury or damage of any kind to the public or to any purchaser, consumer or user of Nutrilite or in connection with Nutrilite and plaintiff's use of the three pamphlets which constitute defendants' sole objection to Nutrilite's sale. Defendants have not, at any time, indicated or contended that there is an emergency or situation of compelling public necessity with respect to the labeling of plaintiff's product and no such emergency or situation did, in fact, exist at or prior to any of the actions of defendants described herein.
43. The evidence herein on the actions, conduct and course of action of defendants before and after the decisions of Crawford, Larrick, Dunbar and Kingsley described above reveal, as do their decisions and actions in making said decisions, that the defendants in making said decisions acted capriciously, arbitrarily, unreasonably, oppressively and unlawfully.

Conclusions of Law
The Court, upon the basis of the Findings of Fact herein, makes Conclusions of Law as follows:
1. This Court has jurisdiction to hear and determine this case.
2. The following provisions of the Food, Drug and Cosmetic Act of 1938, Section 334, Title 21, United States Code Annotated, are unconstitutional under the due process clause of the Fifth Amendment to the Constitution of the United States: "* * * such limitations shall not apply * * * when the Administrator has probable cause to believe from facts found, without hearing, by him or any officer or employee of the agency that * * * the labeling of the misbranded article * * * would be in a material respect misleading to the injury or damage of the purchaser or consumer." The defendants should be permanently enjoined from enforcing this unconstitutional provision against plaintiff.
3. The provisions just quoted in the second conclusion hereof were intended by the Congress to be and are hereby found to be separable from the remaining provisions of the said Act and said remaining provisions remain in full force and effect.
4. Defendants Crawford, Larrick, Dunbar, Kingsley and Ewing, in instituting multiple libel proceedings against the product Nutrilite Food Supplement without first affording the plaintiff a hearing on the issue of whether there was probable cause to believe that the labeling of the product was misleading in a material respect, acted arbitrarily, oppressively, and capriciously in violation of the Fifth Amendment to the Constitution.
5. The defendants and all persons acting in concert with them or under their direction, supervision, or control, should be permanently enjoined from instituting or maintaining any action or proceeding raising issues of fact or law that Nutrilite Food Supplement is misbranded under the Food, Drug, and Cosmetic Act of 1938, by the plaintiff's pamphlets, Exhibits 1, 2 and 3, herein.