498 F.2d 125
 NATICK PATERBOARD CORP. and Crown Paperboard Co., Inc.,
Plaintiffs, Appellants,
v.
Caspar W. WEINBERGER, Secretary of Health, Education and
Welfare, andAlexander M. Schmidt, Commissioner of
Food and Drugs, Defendants, Appellees.
 No. 74-1035.
 United States Court of Appeals, First Circuit.
 Heard May 6, 1974.
Decided June 3, 1974.
 
 Robert J. DeGiacomo, Washington, D.C., with whom Endicott Peabody, John T. Schell, Christopher A. Hart, and Peabody, Rivlin, Lambert & Dennison, Washington, D.C., were on brief, for appellants.
 Robert V. Allen, Atty., Consumer Affairs Section, Dept. of Justice, with whom Thomas E. Kauper, Asst. Atty. Gen., Antitrust Div., Dept. of Justice, Gregory B. Hovendon, Chief, Consumer Affairs Section, Dept. of Justice, Peter Barton Hutt, Asst. Gen. Counsel, Food and Drug Div., Dept. of H.E.W., and Charles J. Raubicheck, Atty., Food and Drug Div., Dept. of H.E.W., for appellees.
 Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.
 McENTEE, Circuit Judge.
 
 
 1
 On July 6, 1973, the Commissioner of Food and Drugs published a new regulation intended to limit the presence in human and animal foods of certain toxic chemicals known collectively as polychlorinated biphenyls (PCB's). Among other things, the new regulation prohibited PCB residues of more than ten parts per million (ppm) in most paper food-packaging materials. 38 Fed.Reg. 18096, 18101-02, (1973) (to be codified at 21 C.F.R. 122.10(a)(9).[1]
 
 
 2
 Appellants are manufacturers of paper food-packaging materials. They and others filed objections to the new regulation insofar as it affected their product. By statute, see 21 U.S.C. 371(e)(2) (1970), the filing of the objections automatically stayed enforcement of the challenged portion of the regulation. However, the Commissioner then announced that until he reached a final decision on the objections he would attempt to enforce de facto compliance with the new regulation by recommending the seizure of any paper food-packaging materials shipped in interstate commerce after September 4, 1973, which contained more than ten ppm of PCB's, on the ground that they were 'adulterated.' 38 Fed.Reg. 22794 (1973). A separate statute grants the Commissioner authority to recommend such seizures in specified circumstances. 21 U.S.C. 334 (1970).[2]
 
 
 3
 Appellants brought the instant action seeking injunctive and declaratory relief against the announced seizures. They contended that their paper food-packaging materials were not 'food' within the meaning of the Federal Food, Drug, and Cosmetic Act, and therefore the Commissioner had no authority to seize the materials, whatever his reasons. The district court did not reach this issue. Instead, it held that it lacked jurisdiction to grant either the injunctive or declaratory relief sought, and on that basis dismissed the complaint. 367 F.Supp. 885 (D.Mass.1973). For the reasons that follow, we affirm as to injunctive relief but reverse as to declaratory relief.
 
 
 4
 In holding that it lacked jurisdiction to enjoin the recommended seizures, the district court correctly relied upon the Supreme Court's decision in Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), rev'g 87 F.Supp. 650 (D.D.C. 1949). There, a three-judge district court had enjoined the government from carrying our recommended seizures of a product which FDA scientists deemed 'misbranded.' The Supreme Court reversed, holding that under 334 the district court lacked jurisdiction to review the FDA's administrative findings prior to the actual institution of seizure proceedings. Id. at 600-602. The Court based this conclusion on the terms of the statute and the policy behind it:
 
 
 5
 'The purpose of the multiple seizure provision is plain. It is to arrest the distribution of an article that is dangerous, or whose labeling is fraudulent or misleading, pending a determination of the issue of adulteration or misbranding. The public therefore has a stake in the jurisdictional issue before us. If the District Court can step in, stay the institution of seizures, and bring the administrative regulation to a halt until it hears the case, the public will be denied the speedy protection which Congress provided by multiple seizures.'
 
 
 6
 Id. at 601. The Ewing Court further held that the statutory scheme, thus construed, did not violate the due process clause because the FDA's determination that seizures should be effected was merely a 'preliminary stage' in the statutory process. Id. at 598.
 
 
 7
 'Whether a suit will be instituted depends on the Attorney General, not on the administrative agency. He may or may not accept the agency's recommendation. If he does, seizures are made and libels are instituted. But the seizures and suits are dependent on the discretion of the Attorney General.'
 
 
 8
 Id. at 599. See also Developments in the Law-- The Federal Food, Drug, and Cosmetic Act, 67 Harv.L.Rev. 632, 705 n. 590 (1954).
 
 
 9
 Appellants contend that Ewing is distinguishable from the instant case and that in any event its authority has been undercut by the Supreme Court's more recent decision in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). We disagree as to both contentions.
 
 
 10
 First, although there are some differences between Ewing and the instant case, these do not warrant a different outcome. Appellants stress that in Ewing the plaintiffs challenged only the scientific findings of the FDA whereas here they challenge the FDA's statutory authority even to consider the dangerousness of their product.[3] Although this is so, we think that the fundamental purpose of 334 recognized in Ewing-- speedy protection of the public from dangerous articles in interstate commerce-- similarly requires that no seizure be halted pending judicial resolution of the definitional issue. Indeed, the policy consideration is even more compelling in the instant case than in Ewing because here the product has been alleged to be toxic, see note 1 supra, while in Ewing no one contended the product was harmful to health. See 339 U.S. at 596.
 
 
 11
 Second, the Abbott Laboratories decision, far from undercutting Ewing, expressly reaffirmed this earlier decision as 'quite clearly correct.' 387 U.S. at 147. The several distinctions noted by the Court between the promulgation of industry-wide regulations at issue in Abbott Laboratories and the recommendation of seizure proceedings under 334 need no further elaboration here. See id. at 146-148.[4] Therefore, we conclude that the district court lacked jurisdiction to grant injunctive relief. Cf. Merritt Corp. v. Folsom, 165 F.Supp. 418 (D.D.C.1958).
 
 
 12
 We now turn to the district court's holding that it lacked jurisdiction to grant declaratory relief. The court did not rely on Ewing for this part of its decision. Instead, it relied on 21 U.S.C. 348(g)(1) (1970), which it construed as vesting exclusive jurisdiction in the courts of appeals on this aspect of the case. 367 F.Supp. at 889. This was error. Section 348(g)(1) applies only to regulations on food additives and thus was an improper basis for the court's decision that it lacked jurisdiction with respect to seizures under 334.
 
 
 13
 This does not necessarily end the matter. The question remains whether 334 itself, as construed in Ewing, precludes jurisdiction in the district court to grant the declaratory relief sought by appellants in the same way that it bars pre-seizure injunctive relief. This is a difficult issue, in which we must accommodate the conflicting policies of two relevant Supreme Court decisions, Ewing and Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 730 (1956).
 
 
 14
 We hardly need to elaborate again the fundamental Ewing policy of promptly protecting the public from dangerous articles in interstate commerce. It is for that reason we hold supra that the statute deprives district courts of jurisdiction to grant pre-seizure injunctive relief even when the question raised is whether the particular product is covered at all by the regulatory statute. On the other hand, it must also be recognized that appellants may be affected in many ways other than by the proposed seizures by the implicit conclusion in the FDA's seizure announcement that their product is now considered 'food' within the meaning of the Act. On this aspect of the case, the Frozen Food decision is relevant. There, the Interstate Commerce Commission issued an 'order' which simply stated that certain commodities were within its regulatory province. The Supreme Court held that a carrier who transported such commodities could immediately obtain district court review of the ICC's announced conclusion, even though no specific ICC action had yet been brought against the plaintiff carrier. In reaching this conclusion, the Court relied strongly on the 'immediate and practical impact' the ICC's announcement would have on the day-to-day business operations of the affected carriers. 351 U.S. at 43-45. In general, Frozen Foods stands for the proposition that where an agency has determined that a particular product or entity falls within its statutory province, the affected private interests are then entitled to judicial review of that decision. The Court repeated this conclusion during its last term in CIBA Corp. v. Weinberger, 412 U.S. 640, 644, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973).
 
 
 15
 In the instant case, it seems clear that if the FDA and simply announced its conclusion that henceforth paper food-packaging materials would be considered 'food' within the meaning of the Act, the policies expressed in Frozen Food would entitle appellants to immediate district court review of that decision. But FDA did more than make a simple announcement. Instead, it linked its definitional conclusion with the further announcement that it will hereafter seize under 334 certain food-packaging materials containing more than 10 ppm of PCB's. Hence, the policies of Ewing come into play as well.
 
 
 16
 We think the best accommodation of these conflicting policies is to construe 334 as not precluding district court jurisdiction to decide the definitional question within the context of an action solely for declaratory relief. At the same time, we want to make clear that the existence of this limited jurisdiction does not permit the district court to halt in any way the seizure of appellants' food-packaging materials while the definitional issue is being resolved. We think teh latter conclusion is compelled by Ewing and by the purpose of 334. Cf. Abbott Laboratories v. Gardner, supra at 156. We recognize that the government may voluntarily delay the institution of seizures pending the district court's decision on the declaratory action. However, that is in no way suggested by this opinion. If, as FDA has determined, there is a threat to public helath caused by PCB's in food-packaging materials, 334 authorizes immediate seizure uninterrupted by the courts, at least until such time that a district court may decide that the materials are beyond the FDA's statutory authority. The interest of protecting the public health is plainly paramount to the business interests of the appellants.
 
 
 17
 Finally, it has been proposed that we decide the definitional issue on the merits at this time. Although we understand the parties' desire for speedy resolution of this question, we nevertheless prefer to wait until we have the considered decision of the district court before us. Cf. Abbott Laboratories v. Gardner, supra at 156. Therefore, we reverse the district court's judgment only with respect to declaratory relief jurisdiction and remand the case to that court for further proceedings not inconsistent with this opinion. Nothing in this opinion shall be deemed to bar the institution of seizures in the interim under 334.
 
 
 18
 It is so ordered.
 
 
 
 [1]
 The regulation provides in pertinent part:
 '122.10 Temporary tolerances for polychlorinated biphenyls (PCB's).
 (a) Polychlorinated biphenyls (PCB's) are toxic, industrial chemicals. Because of their widespread, uncontrolled industrial applications, PCB's have become a persistent and ubiquitous contaminant in the environment. As a result, certain foods and animal feeds, principally those of animal and marine origin, contain PCB's as unavoidable, environmental contaminants. PCB's are transmitted to the food portion (meat, milk and eggs) of food producing animals ingesting PCB contaminated animal feed. In addition, a significant percentage of paper food-packaging materials contain PCB's which may migrate to the packaged food. The source of PCB's in paper food-packaging materials is primarily of certain types of carbonless copy paper (containing 3 to 5 percent PCB's) in waste paper stocks used for manufacturing recycled paper . . .. The temporary tolerances for residues of PCB's are as follows:
 (9) 10 parts per million in paper food-packaging material intended for or used with human food, finished animal feed and any components intended for animal feeds. The tolerance shall not apply to paper food-packaging material separated from the food therein by a functional barrier which is impermeable to migration of PCB's.'
 
 
 [2]
 334. Seizure-- Grounds and jurisdiction
 (a)(1) Any article of food, drug, device, or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce . . . shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States or United States court of a Territory within the jurisdiction of which the article is found: . . .'
 
 
 [3]
 All parties in Ewing appear to have agreed that the product involved there was a 'drug' within the meaning of the statute
 
 
 [4]
 Similarly, the Court has repeatedly referred to the continuing vitality of Ewing, because of the exceptional public policy it involves, in all the major due process decisions of recent years. See Calero-Toledo v. Pearson Yacht Leasing Co., 42 U.S.L.W. 4693, 4697, U.S. , 94 S.Ct. 2080, 40 L.Ed.2d 452 (U.S. May 15, 1974); Mitchell v. W. T. Grant Co., 42 U.S.L.W. 4671, 4675 & n. 11, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (U.S. May 13, 1974); Board of Regents v. Roth, 408 U.S. 564, 570 n. 7, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Fuentes v. Shevin, 407 U.S. 67, 91-92, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Bell v. Burson, 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Boddie v. Connecticut, 401 U.S. 371 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); Goldberg v. Kelly, 397 U.S. 254, 263 & n. 10, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Sniadach v. Family Finance Corp., 395 U.S. 337, 339, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969)