**NATICK PAPERBOARD CORP. et al.**

**v.**

**Caspar W. WEINBERGER, Secretary of Health, Education and Welfare, et al.**

**Civ. A. No. 73–2988–C.**

United States District Court,
D. Massachusetts.

March 4, 1975.

---

Roche, Carens & deGiacomo, Boston, Mass., Endicott Peabody, Robert F. deGiacomo, Washington, D.C., for plaintiffs.

James N. Gabriel, U.S. Atty., William A. Brown, Asst. U. S. Atty., Chief Civ. Div., Boston, Mass., and Charles J. Raubichick, Food and Drug Administration Dept. of HEW, Rockville, Md., for defendants.

## OPINION

CAFFREY, Chief Judge.

This matter came before the Court on remand from the Court of Appeals. In its opinion the Court of Appeals ruled that an order filed by this Court dismissing the complaint for lack of jurisdiction was correct as to so much of plaintiffs' complaint as sought injunctive relief, but was incorrect as to so much of the complaint as sought declaratory relief. The relief sought by plaintiffs is Summary Judgment with a Declaratory ruling that paper food-packaging material is not food under the Food, Drug and Cosmetic Act of 1938, as amended, and that such material is therefore not subject to the seizure, civil, injunctive, or criminal sanctions of the Food, Drug and Cosmetic Act of 1938, as amended.

After the issuance of the mandate by the Court of Appeals, counsel orally re-

argued defendants' motion for summary judgment as to the complaint for declaratory relief and both parties have filed extensive memoranda of law in support of their respective positions. After hearing, I rule as follows:

There is no issue of material fact which requires a trial herein. To assist in understanding the narrow area in which the parties are in disagreement a brief statement of the Secretary's theory of the case and plaintiffs' rejoinder thereto would seem appropriate. The Secretary contends that the declaratory relief sought by plaintiffs should be denied and that this Court should rule that the Secretary can regulate the composition of paper materials used to package food which is shipped in interstate commerce, at least in cases where those packaging materials are of such a nature that the contents of the packaging material can migrate into the contents of the package, i. e., into the food itself. The Secretary's theory is that those food-packaging paper materials whose composition includes a substance called polychlorinated biphenyls (PCB's) may be proscribed by him because the PCB's, when present at a level of more than 10 parts per million, are a toxic substance. The Secretary contends that the PCB's can migrate into the food which the paper containing them is used to package. The Secretary further takes the position that food containing PCB's in excess of the stated level (10 parts per million) is a toxic substance and is adulterated.

Both parties agree that 21 U.S.C.A. § 334(a)(1) prohibits the introduction into interstate commerce of food which is adulterated. That section provides in pertinent part:

"Any article of food . . . that is adulterated . . . shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States . . . within the jurisdiction of which the article is found."

Plaintiffs' position is that, properly construed, § 334(a)(1) only prohibits the introduction into interstate commerce of food which is adulterated. Plaintiffs specifically deny that the section reaches food-packaging material containing PCB's, on the grounds that food-packaging material is not "food" within the meaning of 21 U.S.C.A. § 321(f).

The Secretary specifically argues that such packaging materials should be construed as food within the meaning of § 321(f) and the Secretary also argues that packaging material containing PCB's in excess of 10 parts per million is a food additive within the meaning of 21 U.S.C.A. § 321(s), which is unsafe for human consumption within the meaning of 21 U.S.C.A. § 348 and, therefore, an adulterated food within the meaning of § 342(a)(2)(C).

Basically, the controversy between the parties is as to whether or not food-packaging materials can properly be construed as food within the meaning of § 321(f). That section provides:

"The term 'food' means (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article."

Section 321(s) defines food additives as follows:

"The term 'food additive' means any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food (including any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, *packaging*, transporting, or holding food . . .) . . . ." (Emphasis added.)

Section 321 was enacted in 1938 and some twenty years later the food additive amendment of 1958 was enacted. Significantly, this amendment contained a new provision that a food is adulterated "if it is, or it bears or contains, any food additive which is unsafe within the meaning of section 348 of this title." 21

U.S.C.A. § 342(a)(2)(C). The same amendment added the definition of food additive now contained in 21 U.S.C.A. § 321(s) quoted above. I rule that the clear, unambiguous language of Section 321(s) establishes that food-packaging materials may be found to be food additives. Cf. United States v. Ewig Bros. Co., Inc., 502 F.2d 715, 721 (7 Cir. 1974).

The broadly protective intent of this legislation appears from the legislative history thereof. The Senate Committee report contains the statement, "We want the record to show that in our opinion the bill is aimed at preventing the addition to the food our people eat of any substances the ingestion of which reasonable people would expect to produce not just cancer but any disease or disability." Sen.Rpt.No.2422, 85th Cong., 2d Sess. (1958), 3 U.S.Code Cong. & Admin.News, p. 5310 (1958). The legislative history further establishes that the House subcommittee analyzing the bill considered, and explicitly rejected on the ground of surplusage, a proposed amendment that would have brought "food additive" within the definition of "food." The subcommittee spokesman, Rep. John Bell Williams, stated:

"It was the feeling of the Committee that such a provision would be surplusage since the present Food and Drug law, in section 201(f) [21 U.S. C.A. § 321(f)] already defines 'food' as including all components thereof. Since substances which get into food incidentally in its manufacture, handling or packaging would be dealt with as a 'food additive' under the bill, there appears to be no need to have such substances also defined as a 'food.'" 104 Cong.Rec. 17, 418, Aug. 13, 1958.

From the foregoing, it may be fairly adduced that the committee intended that the same controls and regulations which apply to food also apply to food additives. This is consistent with Congress' concern that the Secretary be empowered to monitor and regulate anything traveling in interstate commerce which ultimately would be ingested by human beings, regardless of the label appended thereto.

In United States v. Dotterweich, 320 U.S. 277 at 280, 64 S.Ct. 134 at 136, 88 L.Ed. 48 (1943), the Supreme Court observed with reference to federal legislation in the area of food and drugs:

"The Food and Drugs Act of 1906 was an exertion by Congress of its power to keep impure and adulterated food and drugs out of the channels of commerce. By the Act of 1938, Congress extended the range of its control over illicit and noxious articles and stiffened the penalties for disobedience. The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words. . . ."

In 1968 that Court reaffirmed the principle that remedial legislation, such as the Food, Drug and Cosmetic Act, is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health, and the Court also told us that this is a "well-accepted principle." United States v. Bacto-Unidisk, 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1968).

The only case discovered specifically applying the philosophy of the Bacto-Unidisk case to the precise type of problem now before this Court resulted in a ruling favorable to the Secretary. In United States v. Articles of Food . . . Pottery . . . Contemporary Ironstone (Cathy Rose), 370 F.Supp. 371 (E.D. Mich.1974), the Secretary sought forfeiture of pottery dinnerware, alleging that it contained a food additive, lead, which the Secretary asserted was unsafe within the meaning of 21 U.S.C.A. § 342(a)(2)(C). The Government's theory in that case was that the lead could migrate from the pottery to the food being served in it. The Court ruled in pertinent part:

"The legislative history leading to the (1958) Food Additives Amendment of

the Act shows a clear Congressional intent that substances which are subject to being ingested by human beings because of migration are 'food additives' and thus 'foods' within the meaning of the Act . . ." (at p. 373.)

Having in mind the statutory provisions quoted herein, the legislative history which I rule is supportive of the Secretary's position, and the attitudinal directives from the Supreme Court in *Dotterweich* and *Bacto-Unidisk, supra,* I rule that plaintiffs have not shown a right to the declaratory relief sought herein, and that defendants are entitled to summary judgment that they have the authority under the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq., to recommend seizure of paper food-packaging material containing polychlorinated biphenyls (PCB's) in excess of 10 parts per million as adulterated food.

Judgment accordingly.