525 F.2d 1103
 NATICK PAPERBOARD CORP.
and
Crown Paperboard Co., Inc., Appellants,
v.
Caspar W. WEINBERGER, Secretary of Health, Education and Welfare,
and
Alexander M. Schmidt, Commissioner of Food and Drugs, Appellees.
 No. 75--1134.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 8, 1975.
Decided Nov. 26, 1975.
 
 1
 Jerome H. Heckman, Washington, D.C., with whom Endicott Peabody, Christopher A. Hart, Peabody, Rivlin & Lambert of Washington, D.C., Paul T. Smith of Boston, Mass., and Keller & Heckman of Washington, D.C., were on brief, for appellants.
 
 
 2
 Alan R. Bennett, Asst. Chief Counsel, Food and Drug Administration, with whom Thomas E. Kauper, Asst. Atty. Gen., Antitrust Div., U.S. Dept. of Justice, Gregory B. Hovendon, Chief Consumer Affairs Section, U.S. Dept. of Justice, Robert V. Allen, Atty., Consumer Affairs Section, Dept. of Justice, and Richard A. Merrill, Chief Counsel, Food and Drug Administration, Washington, D.C., were on brief, for appellees.
 
 
 3
 Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and THOMSEN*, Senior District Judge.
 
 
 4
 THOMSEN, Senior District Judge.
 
 
 5
 Plaintiffs appeal from a summary judgment for defendants, the Secretary of HEW and the Commissioner of Food and Drugs (collectively, FDA), which declared that they have the authority under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. 301 et seq. (the Act), to recommend seizure of paper food packaging material containing polychlorinated biphenyls (PCB's) in excess of 10 parts per million (ppm) as adulterated food. 389 F.Supp. 794 (D.Mass.1975).[1]
 
 
 6
 PCB's are a group of toxic chemical compounds, which find their way into industrial waste, and thence into various products, including recycled paper products. If such a product is used for packaging food, PCB's are likely to migrate into the food unless the food is protected from such migration by an impermeable barrier.
 
 
 7
 Both plaintiffs manufacture paper and paper products, including paper packaging material from waste paper; they sell such material in interstate commerce, and some of it is used by their customers to make containers for packaging food. Plaintiffs argue that food packaging material is not 'food' within the meaning of the Act, and therefore is not subject to seizure as 'adulterated food', and that the notice of intended seizure is overboard.
 
 
 8
 * On July 6, 1973, FDA published a proposed regulation, intended to limit the presence of PCB's in human and animal foods by prohibiting, inter alia, PCB residues of more than 10 ppm in paper food packaging material intended for or used with human food, finished animal feed and any components intended for animal feeds, unless the paper food packaging material is separated from the food therein by a functional barrier which is impermeable to migration of PCB's. 38 F.R. 18096, 18101--02; 21 C.F.R. § 122.10(a)(9).[2]
 
 
 9
 Plaintiffs and others filed objections to subsection (a)(9) of the proposed regulation, and its effectiveness was thereby stayed pending a hearing,[3] which has not yet been scheduled. However, on August 24, 1973, FDA announced that in the interim any paper food packaging material shipped in interstate commerce after September 4, 1973, containing PCB's in excess of 10 ppm, would be seized as 'adulterated' in violation of sec. 402 of the Act, 21 U.S.C. sec. 342, which defines 'adulterated food'. See 38 F.R. 22794.
 
 
 10
 Plaintiffs' complaint herein sought both injunctive and declaratory relief against such seizures. Both were originally denied by the district court because it felt that it lacked authority to grant any relief. 367 F.Supp. 885 (D.Mass.1973). We affirmed the denial of injunctive relief, but reversed the district court's judgment with respect to declaratory relief jurisdiction and remanded the case for further proceedings. 498 F.2d 125 (1 Cir. 1974).[4]
 
 
 11
 After a further hearing, the district court granted summary judgment for defendants (FDA), declaring 'that they have the authority under the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq., to recommend seizure of paper food-packaging meterial containing polychlorinated biphenyls (PCB's) in excess of 10 parts per million as adulterated food.' 389 F.Supp. at 798. Plaintiffs appeal from that judgment.
 
 II
 
 12
 The following sections of the Act relating to adulterated food and food additives are material to the issues presented. All references are to sections of Title 21 of the U.S.Code.
 
 
 13
 Sec. 334(a)(1) and (b) permit seizure of '(a)ny article of food * * * that is adulterated * * * when introduced into or while in interstate commerce or while held for sale * * * after shipment in interstate commerce * * *.'
 
 
 14
 Sec. 321(f) provides: 'The term 'food' means (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article.'
 
 
 15
 Sec. 342(a)(2)(C) states that a food is adulterated 'if it is, or it bears or contains, any food additive which is unsafe within the meaning of section 348.'
 
 
 16
 Sec. 321(s) defines a 'food additive' as 'any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food (including any substance intended for use in * * * packaging * * * or holding food; * * $, if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures * * * to be safe under the conditions of its intended use; * * *.'
 
 
 17
 Sec. 348(a) provides: 'A food additive shall, with respect to any particular use or intended use of such additives, be deemed to be unsafe for the purposes of the application of clause (2)(C) of section 342(a) of this title, unless--(1) * * *; or (2) there is in effect, and it and its use or intended use are in conformity with, a regulation issued under this section prescribing the conditions under which such additive may be safely used.' No such regulation upon which plaintiffs might rely is in effect. Therefore, if paper food packaging material containing PCB's in excess of 10 ppm is a food additive, it is unsafe within the meaning of sec. 348.
 
 III
 
 18
 The affidavits before the district court justify the conclusions that PCB's are toxic, that they tend to migrate from paper packaging material to the contained food by a vapor phase phenomenon, that paper packaging material containing PCB's in excess of 10 ppm is not generally recognized as safe for packaging food for human consumption unless the food is protected from such migration by an impermeable barrier,[5] and that if so used, without such barrier, paper food packaging containing PCB's 'may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of * * * food' within the meaning of sec. 321(s).[6]
 
 
 19
 Since, therefore, paper food packaging material containing PCB's in excess of 10 ppm will in many instances be an 'unsafe food additive' within the meaning of the Act, we proceed to the central issue of this case: whether such material is 'adulterated food' under sec. 342 and thus, under sec. 334(a)(1) and (b), subject to seizure by FDA.
 
 
 20
 Sec. 342(a)(2)(C) provides: 'A food shall be deemed to be adulterated--* * * if it is, or it bears or contains, any food additive which is unsafe within the meaning of section 348 of this title.' Plaintiffs argue that, although PCB's may be introduced into food by migration from the packaging, such introduction is not intentional and therefore the packaging is not 'used for components' of food within sec. 321(f)(3). FDA replies that intentional introduction is not required to meet the definition, and refers to the 'food additive' definition in sec. 321(s), quoted above in Part II of this opinion, and to the legislative history.
 
 
 21
 The food additive provisions of the Act were added by the Food Additives Amendment of 1958, P.L. 85--929, 72 Stat. 1784. Its basic purpose is to permit FDA to regulate the use of substances affecting food without first determining that they are in fact dangerous; the method is to require that such substances be established as safe before being used. A new sec. 348 was added, establishing a procedure for approval by FDA and permitting the agency to establish tolerances and other regulations to insure that these substances will be used safely. Until the FDA has acted, sec. 348(a) provides that substances which meet the definition of 'food additive' are deemed 'unsafe'.[7]
 
 
 22
 The protection of the public from unsafe food additives was accomplished by amending sec. 342(a), defining 'adulterated food'. Among other provisions, a new clause (2)(C) was added to sec. 342(a), stating that a food shall be deemed adulterated 'if it is, or it bears or contains, any food additive which is unsafe within the meaning of section 409 (codified as 21 U.S.C. 348)' (emphasis added). No other means of prohibiting the unauthorized use of unsafe food additives was provided for in the Amendment; none was needed.[8] We conclude that 'unsafe food additives', whether intentional or incidental,[9] are 'adulterated food' under sec. 342(a)(2)(C), and, therefore, may be seized, subject to the provisions of sec. 334(a)(1) and (b).[10]
 
 
 23
 It would defeat the policy of the Act to require, as plaintiffs contend, that FDA must wait until the unsafe food additive has actually entered or come in contact with food before it can be seized; it is enough that FDA has reasonable cause to expect that the additive will be used in such a way as to enter or otherwise come in contact with food. To wait until actual contamination occurs, in the warehouse of the food processor, on the shelf of a grocery store, or in a family kitchen would effectively deny FDA the means to protect the public from adulterated food. United States v. Ewig Bros. Co., Inc., 502 F.2d 715 (7 Cir. 1974), cert. denied, 420 U.S. 945, 95 S.Ct. 1324, 43 L.Ed.2d 423 (1975); United States v. Articles of Food * * * Pottery * * * Cathy Rose, 370 F.Supp. 371 (E.D.Mich.1974). See United States v. Bacto-Unidisk, 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969).
 
 IV
 
 24
 We do not hold, however, that FDA can properly take steps to seize any and all paperboard containing PCB's in excess of 10 ppm wherever it is located and whatever its intended use may be. The district court properly limited its judgment to paper food packaging material. We interpret this to mean that the FDA must be able to prove that any paperboard intended to be seized before it has actually been used as a container for food is either in the hands of a packager of food or in transit to, ordered by, or being produced with the intention that it be sold to a packager of food, or that its intended use otherwise meets the test of sec. 321(s). If the packager or other claimant can show that the food placed in or to be placed in the paper container is or will be insulated from PCB migration by a barrier impermeable to such migration, so that contamination cannot reasonably be expected to occur, the paperboard would not be a food additive and would not be subject to seizure under the Act. So interpreted, the notice of intended seizure is not overbroad.
 
 
 25
 The judgment of the district court, as interpreted in this opinion, is
 
 
 26
 Affirmed.
 
 
 
 *
 Of the District of Maryland, sitting by designation
 
 
 [1]
 See also 367 F.Supp. 885 (D.Mass.1973) and 498 F.2d 125 (1 Cir. 1974)
 
 
 [2]
 The regulation is quoted in 498 F.2d at 126
 
 
 [3]
 See 21 U.S.C. 371(e)(2)
 
 
 [4]
 We said, at p. 129: 'Nothing in this opinion shall be deemed to bar the institution of seizures in the interim under § 334.'
 
 
 [5]
 Cf. United States v. Articles of Food and Drug, . . . Coli-Trol 80, etc., 518 F.2d 743, 746 (5 Cir. 1975); United States v. An Article of Drug 'Bentex Ulcerine', 469 F.2d 875, 878--79 (5 Cir. 1972), cert. denied, 412 U.S. 938, 93 S.Ct. 2772, 37 L.Ed.2d 397 (1973)
 
 
 [6]
 See United States v. Articles of Food . . . Pottery . . . Cathy Rose, 370 F.Supp. 371 (E.D.Mich.1974)
 
 
 [7]
 This purpose of the Amendment was further elucidated in the Senate Report on the bill:
 '. . . we would point out first that under existing law the Federal Government is unable to prevent the use in foods of a poisonous or deleterious substance until it first proves that the additive is poisonous or deleterious. To establish this proof through experimentation with generations of mice or other animals may require 2 years or even more on the part of the relatively few scientists the Food and Drug Administration is able to assign to a particular problem. Yet, until that proof is forthcoming, an unscrupulous processor of foodstuffs is perfectly free to purvey to millions of our people foodstuffs containing additives which may or may not be capable of producing illness, debility, or death.'
 Report of the Senate Committee on Labor and Public Welfare, S.Rep.No.2422, 85th Cong., 2d Sess. 1, 2 (1958), U.S.Code Cong. & Admin.News. 1958, p. 5300.
 
 
 [8]
 Plaintiffs make the argument from syntax: 'it', as used in § 342(a)(2)(C), must first be food before it can be adulterated food. However, plaintiffs do not contend that unsafe food additives intended to be introduced into food may not be seized. We see no sound reason to believe that Congress intended to subject to seizure an unsafe substance reasonably expected to become a component of food through intentional mixing but to exempt from seizure an unsafe substance (in this case packaging material containing PCB's) which is likely to affect the characteristics of food by means of migration when such unsafe substance is put to its intended use
 
 
 [9]
 Both the House and Senate Reports on the Food Additives Amendment contain the following (H.Rep.No.2284, 85th Cong., 2d Sess. 3 (1958); S.Rep.No.2422, 85th Cong., 2d Sess. 4, 5 (1958)), U.S.Code Cong. & Admin.News, 1958, at p. 5303:
 'The legislation covers substances which are added intentionally to food. These additives are generally referred to as 'intentional additives.'
 'The legislation also covers substances which may reasonably be expected to become a component of any food or to affect the characteristics of any food. These substances are generally referred to as 'incidental additives.'
 'The principal example of both intentional and incidental additives are substances intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food.'
 
 
 [10]
 Prior court approval of a seizure by the FDA is not required, and, as we held on the previous appeal in this case, 498 F.2d at 127, no court may restrain a contemplated seizure. Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950). The seizure is by process pursuant to a libel for condemnation filed in a district court against 'the article, equipment or other thing proceeded against', sec. 334(b). The owner or other appropriate person may contest the condemnation, and recover the articles or their value if they were seized unlawfully