## C & K MANUFACTURING & SALES CO., et al., Plaintiffs,

v.

## Clayton YEUTTER, Defendant.

## JETNET CORPORATION, Plaintiff,

v.

## UNITED STATES DEPARTMENT OF AGRICULTURE, et al., Defendants.

### Civ. A. Nos. 90–1888SSH, 90–1967SSH.

United States District Court, District of Columbia.

Aug. 28, 1990.

Stephen Printiss Murphy, Washington, D.C., for C & K Mfg. & Sales.

Dennis R. Johnson, Washington, D.C., for JetNet Corp.

---

Daniel E. Bensing, Asst. U.S. Atty., U.S. Attorney's Office, Washington, D.C., for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on motions for a preliminary injunction filed separately by plaintiffs C & K Manufacturing & Sales Company[1] and JetNet Corporation in these consolidated actions. Upon consideration of the motions, the Government's opposition thereto, and the entire record herein, plaintiffs' motions are granted in part and denied in part.

### Background

C & K is an Ohio company engaged in marketing various products to the food processing industry, including what is commonly referred to as stockinette, an elastic netting material which is widely used to package fresh and cooked cured meats and poultry. Stockinette consists of an elasticized rubber material covered with cotton and is used to hold meat and poultry together so that it retains its shape. Ripple Twist Mills, wholly-owned by the stockholders of C & K, manufactures stockinette for C & K under the trade name "Zip–Net." JetNet also produces and distributes an elastic netting similar to Zip–Net, yet somewhat different in chemical composition, and has done so for over 25 years.

The Food Safety and Inspection Service (FSIS) is the agency of the United States Department of Agriculture (USDA) charged with implementation and execution of the Federal Meat Inspection Act (FMIA), 21 U.S.C. § 601 *et seq.* Under the FMIA, the FSIS is charged with preventing adulterated meat products from entering the stream of commerce. Prior to 1984, both C & K and JetNet obtained letters of approval from the FSIS for use of stockinette in federally inspected meat and poultry establishments. Those letters indicated that plaintiffs' products were chemically accepted for use as packaging material in direct contact with meat and poultry products, as long as the composition and use of the stockinette remained the same.

In 1984, the FSIS published new regulations governing the entry and use of packaging materials. 9 C.F.R. § 317.20. Under subsection (a), the responsibility of ensuring that the materials complied with the relevant provisions of the Federal Food, Drug, and Cosmetic Act (FFDCA) essentially was shifted to the packaging manufacturers.

In August 1988, in response to a request by C & K for approval of a new product, Zip–Net C–656, the FSIS advised C & K that rubber articles for single food use contact were not specifically covered "under federal regulations." The FSIS indicated that it would discuss the matter with officials at the Food and Drug Administration (FDA), but that, until then, it would not disallow the use of Zip–Net C–656 in federally inspected meat and poultry. C & K alleges that it was informed by USDA officials that it would notify C & K if C & K was required to submit a food additive petition for FDA approval pursuant to the FFDCA.

On January 12, 1989, the FDA issued an opinion to the USDA declaring that an approved food additive petition would be necessary for the use of rubber netting for meat products, but adding that consumers would not be injured by the continued use of the netting during the pendency of the petitions. Neither agency appears to have contacted plaintiffs nor the manufacturers as a group regarding the FDA's position. In March 1989, C & K contacted the FDA about obtaining approval for a new vendor's elastic thread. The FDA informed C & K at that time that it believed that a food additive petition would be appropriate to permit the material for "single food-contact use."[2] Although C & K did not necessarily agree that the food additive petition was

---

1. Ripple Twist Mills, Inc., is also a plaintiff in Civil Action 90–1888.

2. Under 21 C.F.R. § 177.2600, rubber articles are approved for repeat use. However, elastic netting constitutes a single-use application since it is only used once on the individual meat and poultry articles.

necessary, it began developing scientific data in response to the FDA's request.[3] In addition, C & K sought to refine the scope of the petition form provided by the FDA so that it would be applicable to a food packaging material such as stockinette, through discussions with its own laboratory and correspondence with the FDA.

On May 8, 1990, C & K submitted its proposed testing procedures to the FDA. The FDA responded to C & K in a May 22, 1990, letter in which it indicated that it would begin reviewing C & K's testing protocol. C & K alleges that it was subsequently orally informed by the FDA both in June and in August that the matter was under consideration by FDA scientists and that a response would be forthcoming.

In the meantime, in the course of conducting a study designed to evaluate a new ham curing process, the FSIS discovered high levels of dibutylnitrosamine (DBNA) in hams from Hatfield Quality meats in Hatfield, Pennsylvania. Because nitrosamines are carcinogens, the FSIS conducted a controlled confirmation study of 12 hams from the Hatfield plant and concluded that hams cured in elastic netting had higher levels of DBNA than hams in the control group. The results of this study, as well as the results of a 1987 study conducted by Sen and others which showed that cured meats packaged in elastic rubber netting contained significant levels of DBNA, were received by the FSIS administrator, Dr. Lester Crawford, on or about July 13, 1990. A subsequent risk assessment, received on July 27, 1990, showed an insignificant risk of short-term exposure to DBNA through meat consumption, but a significant risk of long-term exposure (an increase in the likelihood of cancer of approximately four out of a million).

On July 16, 1990, C & K was contacted by one of its customers who informed C & K of the FSIS test at the Hatfield plant. The customer advised C & K that use of its netting materials had been suspended at that facility and that the FSIS was contemplating a national ban on the materials. C & K immediately began discussions with FSIS representatives in an effort to clarify and resolve the issue. After concluding that the FSIS test methods and results were questionable, C & K began its own testing. On June 23, 1990, C & K met with officials of the FSIS and supplied preliminary data indicating the absence of confirmable levels of nitrosamines in the products which it had sampled. C & K also expressed its willingness to cooperate with the FSIS in further, broader-based testing.

On July 27, 1990, without notice to C & K, JetNet, or apparently any other supplier or packager, the FSIS issued a press release announcing that it would ban the use of all elastic netting materials in cured, cooked meat and poultry products, effective August 13, 1990.[4] JetNet learned for the first time that same day, through a customer, that the FSIS was imposing the ban.

On August 2, 1990, C & K met for one hour with a representative from the USDA General Counsel's office and an FSIS scientist and presented its view that the ban was ill-founded. On August 6, Dr. Crawford confirmed his prior determination as to C & K's elastic netting. That same day, C & K made another request for an administrative hearing. Then, on August 8, it met with Dr. Crawford and others. On August 9, Dr. Crawford advised C & K that it had had an opportunity to present its case, that there would be no hearing, and that it would disapprove C & K's netting for use on cooked, cured meat and poultry.

Similarly, once JetNet learned of the ban, its President and Senior Vice President met with Dr. Crawford and informed him of JetNet's intention to cooperate in providing the FSIS with data. JetNet conducted its own study and concluded that the presence of nitrosamines could not presumptively be

---

3. C & K also did not understand the FDA's determination to be a formal determination that Zip–Net was an indirect food additive requiring a petition.

4. Prior to the issuance of the press release, C & K had requested that any such action be taken through rulemaking, or at least that it not be taken until after a hearing had been held. The FSIS rejected the request.

the result of migration from their elastic netting.[5] On August 8, JetNet officials met with Dr. Crawford, presented him with their data, and asserted its product was in compliance with the FFDCA and should be excluded from the ban. Alternatively, Jet-Net requested an administrative hearing. On August 10, Dr. Crawford advised Jet-Net that he would ban use of its product and that their request for a hearing was denied.

C & K has represented that the ban announced by the FSIS will put it out of business. Although the ban is limited to netting products used on cooked or cured meat and poultry, C & K submits, based on industry reaction thus far, that the industry will probably construe it as a universal ban of the product for all uses. As a result of the FSIS's public announcement, plaintiff Ripple Twist has been forced to shut down its only plant and lay off its 73 workers. In 1989, elastic netting constituted 90% of JetNet's total sales. If the ban is sustained, it will likely also put JetNet out of business.

On August 9, 1990, plaintiffs C & K and Ripple Twist filed their complaint in this Court. On August 10, the Honorable John Garrett Penn granted C & K's motion for a temporary restraining order, enjoining defendants from banning C & K's elastic netting. Defendants then lifted the ban for all nettings. JetNet filed its complaint on August 15, 1990. The Court held a preliminary injunction hearing in both cases on August 20.[6]

### Discussion

In ruling on a motion for a preliminary injunction, the Court must consider four factors: (1) whether plaintiffs have made a strong showing that they are likely to prevail on the merits, (2) whether plaintiffs have shown that, absent such relief, irreparable injury will result, (3) whether issuance of the injunction will harm the interests of the other parties, and (4) whether the public interest supports the granting of relief. *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir.1989); *Washington Metropolitan Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 842 (D.C.Cir.1977).

Plaintiffs have made a strong showing that they are entitled to an administrative hearing pursuant to USDA regulations. Under 9 C.F.R. § 317.20(e),

> The Administrator may disapprove for use in official establishments packaging materials whose use cannot be confirmed as complying with FFDCA and applicable food additive regulations. Before approval to use a packaging material is finally denied by the Administrator, the affected official establishment and the supplier of the material shall be given notice and the opportunity to present their views to the Administrator. If the official establishment and the supplier do not accept the Administrator's determination, a hearing in accordance with applicable rules of practice will be held to resolve such dispute. Approval to use the materials pending the outcome of the presentation of views or hearing shall be denied if the administrator determines that such use may present an imminent hazard to public health.

Defendants argue that it may dispense with the hearing requirement because there are no disputed issues of fact, and thus a hearing would serve no purpose. They argue further that plaintiffs have been afforded the opportunity to present their views and that no further process is due.

---

**5.** JetNet's elastic netting, though similar, has a different composition than C & K's. Their tests showed no detectable amounts of DBNA. Although the test results did show DMNA and DENA, the FSIS also found these nitrosamines in unnetted hams.

**6.** The American Association of Meat Processors and Nodine's Smokehouse, Inc., have moved to intervene as plaintiffs. The motion is not yet

ripe. However, the AAMP and Nodine's did participate in August 20 hearing, as defendants did not object to their participation. The AAMP also provided the Court with four letters from members (including one from Nodine's) expressing their concern about the ban generally, as well as about their lack of notice and opportunity to be heard.

Prior to 1984, the FSIS had a "policy of providing an advisory evaluation of packaging materials prior to use, to ensure they [would] be permitted to be used in the establishment...." 49 Fed.Reg. 2230 (1984). This was not, however, "a mandatory premarket approval procedure." *Id.* Nevertheless, plaintiffs in both of these cases received letters prior to 1984 from the FSIS authorizing the continued use of elastic netting material for use in the meat and poultry curing process. *Id.* Then, in 1984, the FSIS, attempting to clarify its policy on the use of packaging materials for meat and poultry, adopted regulations requiring all official establishments to receive from their suppliers written guaranties that the packaging materials are in compliance with the FFDCA. 9 C.F.R. § 317.20(b). This shifted the burden to the packaging manufacturers to ensure compliance with the FFDCA.

Under the FFDCA, if a substance is a food additive, then it must be approved by the FDA for its particular or intended use. The FFDCA defines a food additive as

any substances the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component ... or any food (including any substance intended for use in packaging [food] ...), if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its use.

21 U.S.C. § 321(s). A food additive that is not approved by the FDA or that is not used consistent with the terms of such approval is "deemed to be unsafe." *Id.* at § 348(a). Foods that contain unsafe food additives are considered "adulterated," *id.* at § 342(a)(2)(C), and are subject to *in rem* seizure and condemnation, *id.* at § 334(a).

▬ The FSIS alleges that the chemical accelerator contained in elastic netting migrates into meat and poultry, and thus that the netting constitutes an indirect food additive. Plaintiffs concede they do not have approved food additive petitions for their respective products. However, contrary to defendants' position, the Court concludes that there are issues of disputed fact which do exist, and that plaintiffs are entitled to a hearing.

Plaintiffs contest defendants' assertion that their products constitute food additives. "The definition of a food additive consists of two elements: (a) the substance must become a component or otherwise affect the characteristics of the food and (b) the substance must lack general recognition among experts as being safe under the conditions of its intended use." *United States v. Articles of Food,* 456 F.Supp. 207, 209 (D.Neb.1978). In *Monsanto Co. v. Kennedy,* 613 F.2d 947, 955 (D.C.Cir.1979), our Court of Appeals made clear that for the component element of this definition to be satisfied, the FDA Commissioner must "determine with a fair degree of confidence that a substance migrates into food in more than insignificant amounts." Plaintiffs have already presented some evidence which may cast doubt on the validity of the FSIS's testing procedures and results with respect to elastic netting. Given the time and opportunity to gather its evidence, plaintiffs may make an even stronger showing. The point is that plaintiffs should not be penalized as being unable to show a genuine dispute when defendants themselves gave plaintiffs no notice whatsoever that it was contemplating such drastic enforcement action before making the public announcement, and plaintiffs have been forced to gather the facts from the defendants in piecemeal fashion. Since the ban was announced, plaintiffs have been conducting their own studies in preparation for a hearing. However, as they pointed out in the August 20 hearing, they have been "behind the eight ball" and "chasing a moving target." [7]

---

7. JetNet has an even futher dispute with the FSIS conclusions. Its elastic netting product

has a different composition than C & K's. The FSIS had not even conducted tests on JetNet's

Furthermore, there was obviously some recognition in the scientific community that elastic netting was safe for use with cured meat and poultry. There is no new product at issue here. After all, FSIS scientists continued to recognize its safety and authorize its use as such. Again, plaintiffs must be given the opportunity to gather and present evidence as to this element.

There is also evidence to show that plaintiffs in good faith believed that they were in compliance with the FFDCA. At least some of the rubber materials contained in elastic netting have been approved by FDA regulations for repeat uses. Moreover, the Court does not overlook the fact that once C & K was given an indication that the FDA would consider its netting product an indirect food additive, it immediately began developing testing procedures with an eye toward submitting an FDA food additive petition (even while not conceding that its product constituted a food additive). It is unacceptable for the Government now to argue that C & K is at fault for failing to obtain FDA approval, when C & K obviously has been attempting in good faith to cooperate with the FDA, but has been met with agency delay. JetNet, too, has a history of good faith compliance with agency statutes and regulations. The Government has apparently chosen to ignore plaintiffs' attempts to comply and instead has tried to change the rules in midstream.

As Administrator of the FSIS, Dr. Crawford certainly has the authority to determine that plaintiffs are not fully in compliance with the FFDCA and applicable regulations. However, before he made the final determination, announced by press release on July 27, 1990, he was required to provide notice to plaintiffs (indeed to all affected official establishments and suppliers) and to give them an opportunity to be heard on the issue. The Administrator did not provide due notice prior to making his final determination. Although he did meet with plaintiffs after his announcement that

he would ban the products, he refused to permit them the requisite hearing, despite the fact that plaintiffs clearly did not "accept the Administrator's determination...." 9 C.F.R. § 317.20(e). To argue that the informal meetings conducted with Dr. Crawford after he already had decided to ban the netting fulfill the hearing requirement makes a mockery of due process and of the regulations themselves.

The USDA and the FSIS have not yet promulgated "applicable rules of practice" with regard to the hearing required by its own regulations. *Id.* However, it is not appropriate to argue that their own failure to have enacted procedural rules prevents plaintiffs from receiving an evidentiary administrative hearing before an impartial adjudicator. The Court agrees that, in the absence of such specific rules, the USDA Uniform Rules of Practice, as set out in Section 7 of the Code of Federal Regulations, are appropriate.

Plaintiffs have requested that all action by the USDA or the FSIS relating to the ban on use of elastic netting in cooked or cured meat and poultry be enjoined pending a final determination by the Court on the merits. This would include enjoining defendants from seizing any meat and poultry cooked or cured with elastic netting. However, the Court concludes that it lacks jurisdiction to enjoin immediate seizure. The Administrator must make the determination whether use of the materials pending the outcome of the hearing will "present an imminent hazard to public health." 9 C.F.R. § 317.20(e); *see also Natick Paperboard Corp. v. Weinberger,* 498 F.2d 125, 129 (1st Cir.1974), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976). This determination obviously has been left to agency discretion. The Court would note, however, that the FSIS has acknowledged to the Court that continued use of the elastic netting presents no imminent health risk in the short term.[8]

---

product when it banned it. Moreover, JetNet has provided evidence that its product does not contain DBNA.

8. Furthermore, in a January 12, 1989, letter to the USDA, the Director of the Division of Food and Color Additives Center for Food Safety and Applied Nutrition at the FDA proposed that the agencies "permit the continued marketing of

There is little question that a universal ban on the use of elastic netting in the cooking and curing of meat and poultry will have disastrous consequences for plaintiffs (as well as for other suppliers and meat packagers). Plaintiffs have shown that their injury is not simply economic; rather plaintiffs will likely not survive if the ban is imposed. Their relationships with meat producers and packagers have been steadily built over 25 or 30 years. Without prior notice, plaintiffs have been unable to develop viable alternatives to mitigate their losses. Unfortunately, the FSIS's announcement has already had a ripple effect in the industry, indicative of what is in plaintiffs' dismal future if the ban is again imposed.[9] In addition, plaintiffs will suffer irreparable injury from the knowledge that in one swooping statement, without notice or the opportunity to be heard, plaintiffs lost their livelihood, built over 25 to 30 year period. This injury is very real and must not be downplayed; plaintiffs, frankly, deserve better from their Government.[10]

Defendants, on the other hand, will suffer little or no injury. The Court is simply ordering them to follow their own regulations, as due process requires. Whether or not defendants feel they would be wasting their time, this does not constitute an injury that would balance the equities in their favor. Furthermore, although defendants have expressed concerns about the length of time required to conduct a full-scale administrative hearing, plaintiffs have expressed their willingness, and indeed their desire, for an expedited proceeding.

Finally, the Court reaches the public interest, perhaps the most important interest in this statutory and regulatory scheme. The FSIS as an agency of the USDA is charged with ensuring the safety of meat products before they reach consumers. Obviously, the public has a strong interest in seeing that the FSIS is able to do its job in as unhindered a fashion as possible. However, the public also has a strong interest in seeing that the FSIS utilizes proper procedures and reaches correct results as to public safety and health risks. Premature determinations that affect the stream of consumer goods or result in undue panic are not in anyone's best interest. Furthermore, the public has a strong interest in the integrity of the administrative process. No citizen should have to live in fear that its Government will be permitted to stamp out its livelihood without notice and a real opportunity to be heard on the issues raised. This is an interest that defendants must not ignore.

An appropriate Order accompanies this Opinion.

SO ORDERED.

## ORDER

Upon consideration of plaintiffs' motions for a preliminary injunction, defendants' opposition thereto, and the entire record herein, for the reasons set forth in the accompanying Opinion, it hereby is

ORDERED, that plaintiffs' motion is granted in part and denied in part. It hereby further is

ORDERED, that defendants shall afford plaintiffs the opportunity for a hearing in accordance with 9 C.F.R. § 317.20(e) and

these rubber threads formulations while requiring the manufacturers to submit food additive petitions for their single-use application for food contact."

9. Furthermore, plaintiffs will be left without an adequate remedy at law even if it is later determined that the USDA made an error.

10. In a letter written to the AAMP and provided to the Court, Robert D. Nueske, President of Nueske Hillcrest Farm Meats, writes: "We believe in our country and for what it stands— Let's not let it let us down!" This is illustrative of the feelings of other suppliers and packagers of whom the Court is aware as well.

the accompanying Opinion.[1]

SO ORDERED.

---

**1.** The Court will not limit the scope of the hearing inquiry as requested by defendants; it would not be prudent to limit the discretion of the Administrative Law Judge.